**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

RICHARD HORNSBY,
               Appellant,

      v.

FEDERAL HOUSING FINANCE
   AGENCY,
               Agency.

DOCKET NUMBER
DC-0752-15-0576-I-2

DATE: April 28, 2022

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

<u>David H. Shapiro</u>, Esquire, Washington, D.C., for the appellant.

<u>Debra L. Roth</u>, and <u>Christopher J. Keeven</u>, Washington, D.C., for
   the agency.

**BEFORE**

Raymond A. Limon, Vice Chair
Tristan L. Leavitt, Member

**FINAL ORDER**

¶1      The agency has filed a petition for review of the initial decision, which reversed the appellant's removal on a charge of conduct unbecoming a Federal manager. For the reasons discussed below, we GRANT the agency's petition for review, REVERSE the administrative judge's finding that the agency

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

failed to prove the charge, and AFFIRM the administrative judge's finding that the appellant failed to prove his affirmative defense. The appellant's removal is SUSTAINED.

## BACKGROUND

¶2 Effective December 5, 2011, the agency appointed the appellant to the Chief Operating Officer (COO) position. *Hornsby v. Federal Housing Finance Authority*, MSPB Docket No. DC-0752-15-0576-I-1, Initial Appeal File (IAF), Tab 6 at 89. The appellant reported directly to the agency's Acting Director, E.D., until January 6, 2014, when the agency appointed another individual as Director. *Id.* at 55. Thereafter, the appellant reported directly to the Director, and E.D. returned to his prior position as Senior Deputy Director for the agency's Division of Housing, Mission, and Goals until April 30, 2014, when he retired from Federal service. IAF, Tab 28 at 48; *Hornsby v. Federal Housing Finance Authority*, MSPB Docket No. DC-0752-15-0576-I-2, Appeal File (I-2 AF), Hearing Transcript, Day 1 (HT1) at 155-56, 173, 228, 272 (testimony of E.D.).

¶3 Although he no longer supervised the appellant once the Director took office, E.D. was responsible for issuing the appellant's 2013 performance evaluation because he had been the appellant's immediate supervisor for the 2013 rating period. HT1 at 173-74 (testimony of E.D.); Hearing Transcript, Day 2 (HT2) at 203-04 (testimony of the Director). In March 2014, E.D. gave the appellant a performance rating for 2013 of "Fully Successful," which precluded him from receiving an executive bonus.[2] IAF, Tab 6 at 74-88; HT1 at 176-77, 199 (testimony of E.D.).

¶4 As COO, the appellant was the immediate supervisor of several agency office directors, including the Director of the Office of Human Resource Management (HR). IAF, Tab 5 at 93. On April 28, 2014, the HR Director notified the agency's Office of General Counsel (OGC) that the appellant had

---

[2] The appellant's performance rating for 2012 was "Outstanding." IAF, Tab 6 at 92-97.

made statements to him earlier in the month indicating that the appellant might harm E.D. and commit suicide. HT1 at 423-24 (testimony of the HR Director). Based on these alleged statements, the agency removed the appellant from the workplace on April 28, 2014, and placed him on administrative leave. IAF, Tab 5 at 88. The appellant was arrested on April 30, 2014, and charged with one felony count of threatening to injure a person. *Id.* The charge was subsequently reduced to two misdemeanor counts of attempted threats to do bodily harm. *Id.* On November 20, 2014, the appellant was acquitted of the criminal charges. IAF, Tab 25 at 20, 29.

¶5      In the meantime, the agency's Office of Inspector General (OIG) investigated the appellant's alleged statements about harming E.D., as well as other complaints it had received regarding the appellant's conduct, including allegations that he had interfered with the agency's equal employment opportunity (EEO) process. IAF, Tab 5 at 447-52.[3] In July 2014, the agency's Acting Inspector General issued a memorandum to the Director detailing the results of OIG's investigation. *Id.* at 447-49. On October 6, 2014, the Director issued a notice proposing to suspend the appellant indefinitely. *Id.* at 88.

¶6      Following the appellant's acquittal, the Director asked OGC to provide him "all information that was available" about the appellant so that he could decide whether the appellant should be allowed to return to work. HT2 at 236 (testimony of the Director). After receiving this information, the Director issued a December 19, 2014 notice rescinding the proposed indefinite suspension and proposing to remove the appellant based on a charge of conduct unbecoming a Federal manager. IAF, Tab 5 at 88-96. The charge was supported by 18 specifications. *Id.* at 89-92.

---

[3] As part of its file, the agency submitted three pages of a five-page July 23, 2014 memorandum from the Deputy Inspector General for Investigation to the Acting Inspector General regarding the appellant's alleged interference in the EEO process and retaliation. IAF, Tab 5 at 450-52. Due to an apparent error, the agency omitted pages 2 and 4 of the memorandum.

¶7     The appellant provided oral and written responses to the proposed removal. IAF, Tab 5 at 38-87.  By letter dated March 19, 2015, the Director[4] sustained all of the specifications and the agency removed the appellant effective March 21, 2015.  *Id.* at 22, 27-33.

¶8     The appellant filed a Board appeal challenging his removal and raising an affirmative defense of retaliation for his prior EEO activity.  IAF, Tab 1 at 4. In support of his affirmative defense, the appellant alleged retaliation for filing an EEO complaint and for participating in the settlement of an HR employee's EEO complaint in his capacity as the agency's EEO settlement officer. IAF, Tabs 17, 19.  The appellant's initial appeal was dismissed without prejudice to refiling and later, automatically refiled.  I-2 AF, Tabs 1-2.

¶9     Following a 5-day hearing, the administrative judge issued an initial decision that reversed the appellant's removal, finding that the agency failed to prove any of the specifications supporting the charge.  I-2 AF, Tab 17, Initial Decision (ID) at 1, 10, 12, 16.  The administrative judge also found that the appellant failed to prove his affirmative defense.  ID at 16-17.  Because the administrative judge reversed the removal action, she ordered the agency to cancel the removal and retroactively restore the appellant with back pay plus interest.  ID at 17-18.  The initial decision did not address the issue of interim relief.  *See* 5 C.F.R. § 1201.111(b)(4) (stating that, if the appellant is the prevailing party, the initial decision shall contain a statement as to whether interim relief is provided).

¶10    The agency has filed a petition for review, the appellant has filed a response to the petition for review, and the agency has filed a reply to the appellant's response.[5]  Petition for Review (PFR) File, Tabs 5, 12-13.  The appellant also has

[4] The Director was both the proposing and the deciding official.  IAF, Tab 5 at 33, 96.

[5] Neither of the parties has challenged the administrative judge's finding that the appellant failed to prove his affirmative defense of EEO reprisal, and we discern no reason to disturb this finding.

filed a request for an order of interim relief, and the agency has filed a response in opposition to the request. PFR File, Tabs 7, 11.

## ANALYSIS

### The appellant's request for interim relief

¶11     Under 5 U.S.C. § 7701(b)(2), if the appellant is the prevailing party, the initial decision will provide appropriate interim relief to the appellant effective upon the date of the initial decision and remaining in effect until the date of the

---

The Age Discrimination in Employment Act states that "personnel actions . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Similarly, title VII requires that such actions "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). In *Savage v. Department of the Army*, 122 M.S.P.R. 612, ¶¶ 48-50 (2015), *clarified on other grounds by Gardner v. Department of Veterans Affairs*, 123 M.S.P.R. 647, ¶¶ 30-31 (2016), the Board adopted the analytical framework of *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), for analyzing claims arising under title VII. The Board in *Savage* held that it first inquires whether the appellant has shown by preponderant evidence that the prohibited consideration was a motivating factor in the contested personnel action. *Savage*, 122 M.S.P.R. 612, ¶ 51. Such a showing is sufficient to establish that the agency violated title VII. *Id.* If the appellant meets her burden, the Board then inquires whether the agency has shown by preponderant evidence that it still would have taken the contested action in the absence of the discriminatory or retaliatory motive. *Id.* If the agency makes that showing, its title VII violation will not require reversal of the action. *Id.*

After *Savage* was decided, the Supreme Court interpreted the language in 29 U.S.C. § 633a(a) in *Babb v. Wilkie*, 589 U.S. ___, 140 S. Ct. 1168 (2020). The Court held that to obtain "injunctive or other forward-looking relief," the plaintiff must show that age discrimination "play[ed] any part in the way a decision [was] made." *Babb*, ___ U.S. at ___, ___, 140 S. Ct. at 1173-74, 1177-78. However, a plaintiff "must show that age discrimination was a but-for cause of the employment outcome" to obtain "reinstatement, backpay, . . . or other forms of relief related to the end result of an employment decision." ___ U.S. at ___, 140 S. Ct. at 1177-78. Thus, under both *Savage* and *Babb*, some relief is available if the prohibited consideration was a motivating factor in the challenged personnel action, but full relief is available only if the prohibited consideration was a but-for cause of the action. Although *Savage* and *Babb* appear to diverge on the question of which party has the burden to prove or disprove but-for causation, we need not decide in this case whether the analytical framework applied in *Savage* must be revised in light of *Babb*. Because the appellant here failed to prove his initial burden that a prohibited factor played any part in the agency's decision, we do not reach the question of whether EEO reprisal was a but-for cause of that decision.

final order of the Board on any petition for review unless, among other things, the administrative judge determines that granting interim relief is not appropriate. 5 C.F.R. § 1201.111(c)(1). The appellant asserts on review that, because he is the prevailing party in this appeal and there has been no determination that granting interim relief would be inappropriate, he is entitled to interim relief. PFR File, Tab 7 at 5. He further asserts that, pursuant to 5 U.S.C. § 7701(b)(2), he is entitled to the relief that the agency was ordered to provide him in the initial decision, i.e., cancellation of his removal and restoration to his position effective the date of his removal. *Id.*; ID at 17.

¶12　　　Contrary to the appellant's contention, 5 U.S.C. § 7701(b)(2)(A) and the Board's regulations governing interim relief provide that the effective date of such relief is the date of the initial decision, not the date of the adverse action. *See* 5 C.F.R. §§ 1201.111(b)(4), (c)(1)-(2). In any event, the appellant's arguments regarding interim relief are now moot because interim relief is in effect only pending the disposition of a petition for review. *See* 5 U.S.C. § 7701(b)(2)(A); *Garcia v. Department of State*, 106 M.S.P.R. 583, ¶ 7 (2007). Accordingly, we deny the appellant's request for interim relief.[6]

The charge

¶13　　　On review, the agency challenges the administrative judge's findings that it did not prove any of the specifications supporting the charge, and it asserts that it proved every specification. PFR File, Tab 5. A charge of conduct unbecoming

---

[6] As a part of the initial decision, an interim relief order is subject to challenge in a petition for review or cross petition for review. *Merino v. Department of Justice*, 94 M.S.P.R. 632, ¶ 6 (2003); *Brown v. U.S. Postal Service*, 54 M.S.P.R. 275, 277 (1991). Because the appellant did not file a petition for review or cross petition for review of the initial decision, we find that his failure to do so is an additional basis for denying his request for interim relief. *See Thompson v. Department of the Air Force*, 104 M.S.P.R. 529, ¶ 7 (2007). Even if we were to construe the request as a cross petition for review, the administrative judge's failure to address interim relief in the initial decision was not reversible error because we find that the appellant is not entitled to any relief in this case. *See Marshall-Carter v. Department of Veterans Affairs*, 94 M.S.P.R. 518, ¶ 14 n.2 (2003), *aff'd*, 122 F. App'x 513 (Fed. Cir. 2005).

has no specific elements of proof; the agency establishes the charge by proving the appellant committed the acts alleged under this broad label. *See Canada v. Department of Homeland Security*, 113 M.S.P.R. 509, ¶ 9 (2010). The agency also must prove that the conduct was unattractive, unsuitable, or detracted from the appellant's character or reputation. *Miles v. Department of the Army*, 55 M.S.P.R. 633, 637 (1992).

¶14    For ease of discussion, we have divided the specifications into two groups based on the administrative judge's reason for finding that the agency failed to prove the specification. The first group consists of specifications 5-11 and 18. The administrative judge found that the appellant engaged in the conduct described in these specifications; however, it was not conduct unbecoming a Federal manager. ID at 14-16. As for the second group, i.e., specifications 1-4 and 12-17, the administrative judge found that the agency failed to prove that the conduct described in these specifications occurred.[7] ID at 7-10, 12-14. We first consider specifications 5-11 and 18.

Specifications 5 and 6

¶15    Specifications 5 and 6 involve comments that the appellant made about EEO complaints during meetings with various agency officials in 2012. IAF, Tab 5 at 90. In specification 6, the agency alleged that on September 7, 2012, the appellant told a group of agency employees—including the EEO Director, the HR Director, the HR Deputy Director, and agency attorneys—that employees should not be allowed to make anonymous EEO complaints and that EEO complainants should have more "skin in the game." *Id.* Yet notes from the meeting appear to show that the appellant's remarks followed the EEO Director describing in the meeting how resolving EEO complaints is more difficult when

---

[7] Regarding specification 12, which involved the appellant's alleged threats to outsource the agency's HR function, the administrative judge further found that, even if the appellant had committed the specified conduct, it would not constitute conduct unbecoming a Federal manager. ID at 13 n.14.

the complainants are anonymous.  IAF, Tab 28 at 87.  Thus, the appellant sharing his opinion on this matter does not necessarily seem out of place.  In specification 5, the agency alleged that in late August or early September of 2012, the appellant told the agency's EEO and Diversity Director and an EEO Counselor that he did not believe any of the complaints about the HR Deputy Director, and that if there were any more complaints about her, there would be "serious consequences," or words to that effect.  *Id.*  This allegation is in fact quite troubling, as such a statement expresses retaliatory intent and could clearly have a chilling effect in the agency.  Nevertheless, as the administrative judge noted of both specifications, the agency failed to impose discipline on the appellant when the remarks were made in 2012, instead merely taking the remedial step of advising the appellant of the legal and policy importance of allowing employees to file anonymous internal complaints.  ID at 14.  Given these circumstances, we find no reason to disturb the administrative judge's findings that the agency failed to prove specifications 5 and 6.

Specification 7

¶16      In specification 7, the agency alleged that, during an April 22, 2013 meeting with a Senior Economist who had sent the appellant an email seeking clarification about pay raises, the appellant held up a copy of the email and said, "[L]ooking at this email . . . I found it [expletive] offensive."  IAF, Tab 5 at 90, Tab 6 at 63-64.  The agency further stated that when the Senior Economist responded by saying that he had to leave because the appellant had just cursed at him, the appellant apologized, and the employee stayed.  IAF, Tab 5 at 90.

*¶17*      In finding that the agency failed to prove this specification, the administrative judge reasoned as follows:  "Most adults curse at least occasionally and [F]ederal managers are adults."  ID at 15.  The administrative judge found that "a single instance of uttering the word '[expletive]' in this context, especially if one apologizes afterward, is not conduct unbecoming a [F]ederal manager."  *Id.*

¶18    Based on our review of the record, we find that the behavior described in specification 7 is conduct unbecoming a Federal manager. The Board has frequently held that rude, discourteous, and unprofessional behavior in the workplace is outside the accepted standards of conduct reasonably expected by agencies and can be the subject of discipline. *See Holland v. Department of Defense*, 83 M.S.P.R. 317, ¶¶ 10-12 (1999) (sustaining a removal for rude and discourteous behavior); *Wilson v. Department of Justice*, 68 M.S.P.R. 303, 309-10 (1995) (sustaining a removal for disrespectful conduct and the use of insulting, abusive language). Although an employee may be allowed more leeway with disrespectful conduct in "certain emotional, confrontational contexts," the conduct at issue in this specification occurred in a normal employment setting where the appellant should have expected normal standards of conduct to apply. *See Hamilton v. Department of Veterans Affairs*, 115 M.S.P.R. 673, ¶¶ 11, 13 (2011). Moreover, the Board has held that, in a conduct unbecoming charge, an agency can hold a supervisor to a higher standard of behavior than other employees. *See Ray v. Department of the Army*, 97 M.S.P.R. 101, ¶ 58 (2004), *aff'd*, 176 F. App'x 110 (Fed. Cir. 2006); *Special Counsel v. Zimmerman*, 36 M.S.P.R. 274, 293 (1988) (stating that, because the appellant was a supervisor, he is held to a higher standard of conduct than subordinate employees and should set an example for other employees to follow). Accordingly, we find that the agency proved specification 7 of the charge.

Specification 8

¶19    In specification 8, the agency alleged that, on several occasions, the appellant made remarks about specific employees in inappropriate settings and/or in the presence of employees who should not have heard these comments. IAF, Tab 5 at 90-91. This specification consists of three allegations: (1) during a November 13, 2013 meeting with employees from various offices, including Facilities Operations and OGC, the appellant stated in front of everyone in attendance that a specific Senior Facilities Management Specialist (FMS) should

be put on a performance improvement plan (PIP); (2) during a March 26, 2014 meeting with the Manager of Contracting Operations (MCO), the appellant made a comment about a specific Senior Management Analyst who had filed an EEO complaint against the agency, stating something to the effect that the employee, who did not work in Contracting Operations, had a "situation that was bringing outside people into the agency"; and (3) on other occasions, the appellant made remarks in front of the MCO about the performance of employees that she did not supervise, such as words to the effect that, "you can be sure this"[8] will negatively "affect [the Chief Information Officer's] rating."[9]  *Id.* (brackets as in the original).

¶20    The administrative judge found that "while criticizing one employee in front of others is not a management best practice, under the circumstances described in the record it is also not conduct unbecoming a [F]ederal manager." ID at 15.  The administrative judge does not identify the basis for her conclusion that the appellant's criticism of specific employees in front of other employees was not conduct unbecoming.  ID at 15; *see Spithaler v. Office of Personnel Management*, 1 M.S.P.R. 587, 589 (1980) (stating that an initial decision must identify all material issues of fact and law, summarize the evidence, resolve issues of credibility, and include the administrative judge's conclusions of law and his legal reasoning, as well as the authorities on which that reasoning rests).  Consequently, to determine whether the agency proved specification 8, we have considered the context in which the appellant made the statements at issue in this specification.

---

[8] The record shows that the appellant was referring to the allegations in the MCO's grievance against the agency's Chief Information Officer (CIO), who reported directly to the appellant.  Hearing Transcript, Day 4 (HT4) at 265 (testimony of the appellant). In her grievance, the MCO claimed that the CIO and some members of his staff had created a hostile work environment.  Hearing Transcript, Day 3 (HT3) at 250 (testimony of the MCO).

[9] The proposal notice and decision letter incorrectly identify the CIO as the "Chief Operating Officer."  IAF, Tab 5 at 30, 91.

¶21     Based on our review of the record, we find that the appellant did not engage in conduct unbecoming either by stating that the Senior FMS should be put on a PIP or by telling the MCO that the allegations in her grievance against the CIO would be reflected in his performance evaluation. During his testimony, the appellant explained that he made these statements while discussing the MCO's allegations against the Senior FMS and the CIO. Specifically, the appellant testified that, during the November 13, 2013 meeting, the MCO alleged that the Senior FMS had communicated with a bidder during a period when he was not allowed to do so, and, in response, he stated that if this allegation were true, then the Senior FMS should be held accountable and placed on a PIP. Hearing Transcript, Day 4 (HT4) at 259, 261 (testimony of the appellant). The appellant similarly testified that, while discussing the MCO's grievance against the CIO, he told the MCO that the allegations in her grievance, if true, would negatively affect the CIO's performance evaluation. *Id.* at 265. Thus, the appellant made these statements to explain how the agency would address the MCO's allegations against other employees if they were proven. Given these circumstances, we find that these statements were not improper.

¶22     We also find, however, that the appellant engaged in unbecoming conduct during his March 26, 2014 meeting with the MCO by telling her that a specific employee had filed an EEO complaint. IAF, Tab 6 at 69. The record indicates that the appellant made this statement during a discussion about outsourcing information technology services to illustrate that one advantage of outsourcing is that the agency does not have to deal with personnel matters involving services that have been outsourced. IAF, Tab 5 at 101-02, Tab 6 at 69; Hearing Transcript, Day 3 (HT3) at 244-45, 285-86 (testimony of the MCO).[10] The appellant clearly could have made the same point without revealing the name of

---

[10] The appellant testified that he did not remember making any statements about the EEO complainant to the MCO, but conceded that "it may have happened." HT4 at 263-64 (testimony of the appellant).

an EEO complainant. Informing the MCO that a specific employee had filed an EEO complaint demonstrates poor judgment and is clearly unsuitable, particularly given the appellant's position as COO. Accordingly, we find that the agency proved this part of specification 8. *See Green v. Department of the Navy*, 61 M.S.P.R. 626, 633 n.10 (explaining that portions of a specification that constitute individual allegations of misconduct under a charge may be independently sustained), *aff'd*, 36 F.3d 1116 (Fed. Cir. 1994) (Table).

Specification 9

¶23        In specification 9, the agency alleged that, during a meeting with E.D. in late November 2013, the appellant became agitated when E.D. questioned him. IAF, Tab 5 at 91, Tab 22 at 24. The administrative judge found, and we agree, that "becoming agitated" is not conduct unbecoming a Federal manager. ID at 15.

Specification 10

¶24        In specification 10, the agency asserted that, during a February 20, 2014 meeting with several employees about the National Mortgage Database (NMD),[11] the appellant placed his hand over the NMD Project Director's mouth to prevent him from making further comments. IAF, Tab 5 at 91. In addressing this specification, the administrative judge noted that neither the appellant nor the Project Director remembered the appellant engaging in such conduct; however, it "made a big impression" on the lead counsel for the NMD project. ID at 15 (citing Hearing Compact Disc (CD) (testimony of the appellant, the Project Director, and the lead counsel)); HT2 at 332-35 (testimony of the lead counsel); HT3 at 359 (testimony of the Project Director); HT4 at 273-74 (testimony of the appellant). The administrative judge concluded that the alleged conduct

---

[11] The NMD is a resource that contains information about mortgages throughout the United States. HT3 at 245-48 (testimony of the NMD Project Director). The record indicates that about 20 people attended the meeting, including the General Counsel and the lead counsel for the NMD project. IAF, Tab 5 at 98; HT2 at 323, 330-31 (testimony of the lead counsel); HT3 at 380 (testimony of the Project Director).

occurred; however, it probably was not a "big deal" to the Project Director, given his testimony that he "tends to need to be silenced" and that the appellant was his friend. ID at 15; HT3 at 358 (testimony of the Project Director). The administrative judge found that, under these circumstances, the appellant's conduct was not unbecoming. ID at 15.

¶25 Although the Project Director was not offended by the appellant's actions, we find that it was improper and unsuitable for the appellant—who was the Project Director's immediate supervisor as well as COO—to place his hands over the Project Director's mouth to prevent him from speaking during a meeting. HT3 at 344, 359-60 (testimony of the Project Director). Therefore, we find that the agency proved this specification.

Specification 11

¶26 Specification 11 involves a statement that the appellant made in late February or early March of 2014, to the NMD's lead counsel and another attorney, both of whom had drafted a memorandum to the Director addressing the agency's potential liability for data breaches of the NMD. IAF, Tab 5 at 91, 98 (written declaration of the lead counsel). The agency alleged that the appellant engaged in conduct unbecoming by telling the attorneys that issuing the memorandum might be a "career ender." *Id.* at 91. The agency further stated that the lead counsel interpreted the appellant's statement as referring to ending the careers of both attorneys, who then removed the information at issue from the memorandum. *Id.* at 91, 98. The appellant testified that he was referring to his own career when he used the term "career ender." *Id.*; HT4 at 277-79 (testimony of the appellant).

¶27 The administrative judge found that telling a staff attorney that the contents of a memorandum could end a career is not conduct unbecoming a Federal manager. She did not provide a basis for her conclusion. ID at 15-16. The agency challenges this finding on review, arguing that the attorneys "reasonably understood" the appellant's statement as a threat to their careers and felt

compelled to modify the memorandum to "diminish their analysis" of the risks associated with the NMD as a direct result of this "intimidating" statement. PFR File, Tab 5 at 38-39.

¶28 Regardless of whose career might be allegedly ended by the inclusion in the memorandum of the information in question, it is understandable that the attorneys felt intimidated into removing the information. The record indicates that the attorneys had already revised the memorandum several times, but that the appellant continued to be unhappy with the memorandum including information on potential agency liability. Given the appellant's inappropriate behavior on multiple occasions and the alleged threatening statements the appellant made in 2012 regarding EEO complaints, we find believable the attorneys' allegations that, by his "career ender" remark, the appellant was intimidating them regarding their careers and not his own. We believe it is reasonable for an agency to conclude that "an atmosphere of intimidation is not conducive to the productive flow of ideas and communication that is vital" to the agency, IAF, Tab 5 at 94, particularly as it relates to information about potential agency liability. Thus, we find that the conduct specified in charge 11 constituted conduct unbecoming a Federal manager and that the agency proved this specification.

Specification 18

¶29 In specification 18, the agency alleged that, after he became aware of his "Fully Successful" performance rating, the appellant asked the HR Director to negotiate with E.D. on his behalf for a higher rating so that he would receive a bonus. IAF, Tab 5 at 92. The agency further alleged that the appellant sent the HR Director the following email on April 24, 2014:

> Please make sure [E.D.] does not give me a partial bonus. I want the goose egg that reflects the unfair rating he gave me. If he suggests a 5 or 10 to further insult me I want it stopped before he leaves. I want [the bonus] 0 to reflect what he told me to my face. If he does otherwise I will seek legal counsel.

> He continues not to resolve my [job performance plan] escalation!
> He has been nonresponsive. There is no excuse for his behaviour.

*Id.*; IAF, Tab 6 at 59.

¶30 The administrative judge found that, contrary to the specification, the HR Director testified that he volunteered to intervene on the appellant's behalf with E.D. ID at 16 n.16 (citing Hearing CD). The administrative judge further found that "nothing about the contents of the email was unattractive or unsuitable, detracted from his character or reputation, or created an unfavorable impression." ID at 16.

¶31 The record does not support the administrative judge's finding that the HR Director testified that he volunteered to negotiate with E.D. for a better performance rating for the appellant.[12] During the Board hearing and the criminal trial in this matter, as well as in his written statement dated April 28, 2014, and his interview with OIG agents the same day, the HR Director consistently stated that the appellant had asked him to negotiate with E.D. to improve the appellant's performance rating. IAF, Tab 5 at 316-17 (criminal trial testimony of the HR Director), Tab 6 at 33, 52; HT1 at 356-58; HT2 at 148-49, 151-52 (testimony of the HR Director). Moreover, during the appellant's criminal trial, the HR Director responded as follows when asked whether he volunteered to negotiate with E.D. to improve the appellant's performance rating: "That's not an assignment I would volunteer for." IAF, Tab 5 at 317 (criminal trial testimony of the HR Director). This statement is consistent with the HR Director's testimony at the hearing that he felt awkward asking E.D. to improve the appellant's performance rating. HT2 at 148-49 (testimony of the HR Director). Thus, the record shows that the appellant asked the HR Director to intervene with E.D. to improve his performance rating.

---

[12] This finding also appears to contradict the administrative judge's determination that the appellant "entreated [the HR director] to intervene" as part of his "campaign to change [E.D.'s] mind about the rating." ID at 3 (citing IAF, Tab 6 at 59, 73; and testimony of the appellant, E.D., and the HR Director).

¶32     We find that it was improper for the appellant to do so. As previously noted, the appellant was the HR Director's immediate supervisor. Thus, in making this request, the appellant was placing the HR Director in the untenable position of either refusing his supervisor's request or negotiating with his former second-level supervisor for a better performance rating for his supervisor. Further, while the HR Director's office was responsible for processing performance ratings and bonuses, HT2 at 166-67 (testimony of the HR Director), there is no evidence that HR Director's duties vis-à-vis performance ratings entailed negotiating better ratings for agency employees. Given these circumstances, we find that it was clearly unsuitable for the appellant to ask the HR Director to undertake such a negotiation on his behalf.

¶33     We also disagree with the administrative judge's finding that there was nothing unsuitable about the appellant's email to the HR Director. ID at 15. In the email, the appellant made disparaging remarks about E.D. to his subordinate, stating that E.D.'s behavior was inexcusable. IAF, Tab 6 at 59. The Board and our reviewing court have held that making disparaging comments about one's superior to a subordinate employee constitutes conduct unbecoming a Federal employee. *See Guise v. Department of Justice*, 330 F.3d 1376, 1380 (Fed. Cir. 2003) (affirming the removal of a supervisory correctional officer charged with making disparaging remarks to subordinate employees regarding the associate warden); *Ray*, 97 M.S.P.R. 101, ¶ 58 (finding that a supervisor's disparaging comments about agency officials, including his superior, which were directed to a subordinate agency employee with no apparent need to know the appellant's views regarding those officials, constituted conduct unbecoming a Federal employee). We therefore find that the agency proved specification 18.

Specifications 1-4 and 12-17

¶34     We next consider the second group of specifications. Specifications 1-4 involve the appellant's alleged statements to the HR Director about E.D., which

the HR Director reported to OGC on April 28, 2014.  IAF, Tab 5 at 89-90, Tab 6 at 34.  In these specifications, the agency alleged as follows:

> (1) On April 3, 2014, the appellant said to the HR Director, "I can understand how someone could go postal, if I decide to take myself out I will walk into [E.D.'s] office and blow his brains out and then kill myself."

> (2) On April 3, 2014, the appellant also told the HR Director that he might not "blow [E.D.'s] brains out" but would shoot him in the kneecap and say, "don't [expletive] with me."

> (3) On April 24, 2014, the appellant told the HR Director that E.D. had done nothing about the appellant's performance rating and made the following statement in reference to E.D:  "[T]hat son of a [expletive] is not in his office today but if he was [I] would go there and rip him limb by limb from his office."

> (4) On April 24, 2014, the appellant indicated to the HR Director that he would make a scene at E.D.'s retirement party and tell everyone the kind of person that E.D. really was, but that he would not physically hurt E.D. at the party.

IAF, Tab 5 at 89-90.

¶35      In specifications 12-17, the agency alleged as follows:

> (12) On several occasions, when the appellant could not hire someone he wanted or an HR employee would complain to the Inspector General or E.D. about the HR Deputy Director, he told the HR Director that he would outsource the HR function.

> (13) When the MCO complained to the appellant about outsourcing contract services involving information technology to the Department of the Interior's Business Center, the appellant frequently told the HR Director that he would outsource the MCO's office if she did not stop complaining.

> (14) On April 3, 2014, the appellant told the HR Director that he wanted an HR employee fired because the appellant saw her having breakfast with E.D., although he had previously spoken to the HR Director about converting that employee to a permanent appointment because of her success with the agency's recruiting program.

> (15) Between April 8 and 24, 2014, the appellant told the HR Director, "I can't wait until the 30th when the Pope [referring to E.D.] leaves the building."

(16) The appellant lost his composure during an April 22, 2014 meeting with various agency officials and expressed his desire to fire anyone who had complained about him.

(17) The appellant repeatedly expressed his hatred of E.D. to the HR Director and, on multiple occasions, including April 22, 2014, told the HR Director in a very serious tone that he wanted to jump out of his window or blow his brains out.

*Id.* at 91-92.

¶36    In the initial decision, the administrative judge noted that the appellant and the HR Director provided conflicting testimony regarding whether the appellant engaged in the conduct described in these specifications.  ID at 7-8, 12-14.  She also noted that the HR Director provided the only evidence in support of several specifications, including specifications 1-4, which were based on alleged conversations during which only the appellant and the HR Director were present. *Id.* at 8, 14.  Citing the Board's decision in *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987),[13] the administrative judge found that the appellant's denial that he made the statements in specifications 1-4 was "at least as credible" as the HR Director's accusations that he did and that, therefore, the agency failed to prove these specifications by preponderant evidence.  ID at 8.  The administrative judge similarly found that the record did not contain preponderant evidence supporting specifications 12-17.  ID at 12-14.  In making this finding, she explicitly credited the appellant's testimony denying the conduct described in specifications 14 and 15.  ID at 13.

---

[13] In *Hillen*, the Board held that, to resolve credibility issues, an administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version he believes, and explain in detail why he found the chosen version more credible, considering such factors as:  (1) the witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor.  *Hillen*, 35 M.S.P.R. at 458.

¶37    The agency argues on review that the Board should not defer to the administrative judge's credibility determinations because the initial decision makes no reference to witness demeanor.  PFR File, Tab 5 at 22.  The agency asserts that the Board should therefore reweigh the evidence and substitute its own judgment on the issue of whether the appellant's testimony is more credible than the HR Director's.  *Id.* at 22-23.  The agency contends that applying the *Hillen* factors to the evidence shows that the HR Director is "far more credible" than the appellant.  *Id.* at 28.

¶38    This argument is unpersuasive.  The Board must defer to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on observing the demeanor of witnesses testifying at a hearing, and the Board may overturn such credibility findings only when it has "sufficiently sound" reasons for doing so.  *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002).  It is well established that when, as here, an administrative judge has heard live testimony, her credibility determinations must be deemed to be at least implicitly based upon the demeanor of the witnesses.  *See Purifoy v. Department of Veterans Affairs*, 838 F.3d 1367, 1373 (Fed. Cir. 2016) (finding that the Board must defer to an administrative judge's demeanor-based credibility determinations, "[e]ven if demeanor is not explicitly discussed"); *Little v. Department of Transportation*, 112 M.S.P.R. 224, ¶ 4 (2009).  Thus, the Board may overturn credibility findings only when it has "sufficiently sound" reasons for doing so, as when the administrative judge's findings are incomplete, inconsistent with the weight of the evidence, and do not reflect the record as a whole.  *Rapp v. Office of Personnel Management*, 108 M.S.P.R. 674, ¶ 13 (2008).

¶39    Based on our review of the record, we find that the agency has not established that there are sufficiently sound reasons for overturning the administrative judge's credibility determinations.  *See Crosby v. U.S. Postal Service*, 74 M.S.P.R. 98, 105-06 (1997) (finding no reason to disturb the administrative judge's findings when she considered the evidence as a whole,

drew appropriate inferences, and made reasoned conclusions). In the initial decision, the administrative judge explained in detail why she did not credit the HR Director's testimony that the appellant engaged in the alleged misconduct. ID at 8-10, 12-14. For example, the administrative judge found that the HR Director had a motive to fabricate the allegations set forth in specifications 1-4 because he was under a great deal of stress in April 2014, due to the following circumstances: (1) his employees were complaining about the HR Deputy Director; (2) he felt pressured to intervene to improve the appellant's performance evaluation; (3) E.D., with whom he felt comfortable, was about to leave, and the additional work and uncertainty of a new Director were upon him; (4) he was in the middle of an ongoing dispute between his first- and second-level supervisors about the appellant's performance rating; and (5) he was looking for another job. ID at 8-9. The administrative judge concluded that, as a result of these circumstances, the HR Director "had motive to act in an extreme manner to change his workplace dynamic." ID at 9.

¶40    The agency argues on review that the Board should not defer to the administrative judge's credibility determinations regarding specifications 1-4 because the record does not support her finding that the HR Director's work circumstances in April 2014, were "spectacularly stressful." PFR File, Tab 5 at 26; ID at 9. Specifically, the agency asserts that: (1) complaints about the HR Deputy Director subsided after the HR office was reorganized in June 2013; (2) there is no evidence that the arrival of a new Director resulted in additional work for the HR Director; and (3) the HR Director was not involved in an ongoing dispute between his first- and second-level supervisors, as the Director was his second-level supervisor when he made the allegations against the appellant, and there was no dispute between his first-level supervisor (i.e., the appellant) and the Director at that time. PFR File, Tab 5 at 24-25. The agency also challenges the administrative judge's finding that the HR Director had a motive to fabricate allegations because he was looking for a job. *Id.* at 25;

ID at 9. Instead, the agency argues, because the HR Director was about to leave his position, it was likely that he would not act in such a manner in his final months at the agency. PFR File, Tab 5 at 25.

¶41 Even assuming that the HR Director did not have a motive to fabricate the allegations in specifications 1-4 based on the circumstances cited by the administrative judge, we find that this is not a sufficiently sound reason to overturn the administrative judge's credibility determinations. The administrative judge's conclusion that the HR Director had a motive to fabricate these allegations was not her only reason for finding the HR Director's testimony not credible. The administrative judge also found that the HR Director's version of several of the events at issue did not "incorporate logically with substantiated record evidence." ID at 9-10. In particular, the administrative judge found that, during his testimony, the HR Director failed to satisfactorily explain why he did not tell E.D. about the appellant's alleged statements until April 28, 2014, and why, after waiting so long, it was necessary to tell E.D. at all. ID at 10.

¶42 In assessing the relative credibility of the appellant and the HR Director, the administrative judge also found it "worth noting" that the appellant did not incriminate himself in telephone calls that the HR Director initiated on April 28 and 29, 2014, at OIG's request for the purpose of eliciting the appellant's acknowledgement that he made statements about harming E.D. ID at 9 n.12; IAF, Tab 6 at 20-32, 36-50. The administrative judge noted that, during these telephone calls, the appellant did not acknowledge that he had threatened E.D. or indicate that he knew he was being recorded. ID at 9-10 n.12. In addition, the administrative judge found that, instead of directly confronting the appellant about his alleged statements concerning E.D., as OIG had instructed him to do, the HR Director told the appellant that investigators had questioned him about comments that the appellant had made to him about how the appellant would "take [E.D.] out" if he ever wanted to hurt himself, and the appellant disputed that characterization. ID at 10 n.12; IAF, Tab 6 at 28. The administrative judge

also noted that the HR Director subsequently cut the appellant off while he appeared to be denying the alleged misconduct.  ID at 10 n.12; IAF, Tab 6 at 29.

¶43        Moreover, the administrative judge's credibility determinations regarding the HR Director are consistent with those of the superior court judge in the appellant's criminal trial.  In her written opinion, the superior court judge stated that there were numerous reasons to doubt the HR Director's credibility, including his behavior during the recorded telephone calls between him and the appellant in late April 2014, and his delay in reporting the appellant's purported statements about harming E.D. and committing suicide to anyone in a position to take action to protect E.D. and the appellant.  IAF, Tab 5 at 76-87.  Thus, we discern no reason to disturb the administrative judge's credibility determinations regarding specifications 1-4.

¶44        As for specifications 12-17, the agency briefly argues on review that the administrative judge failed to consider "significant evidence" in finding that the record did not include preponderant evidence to support these specifications, and it asserts that the record shows that these specifications "are more likely true than not."  PFR File, Tab 5 at 32-33.  This argument is essentially mere disagreement with the administrative judge's explained findings and credibility determinations, and provides no basis for us to reweigh the evidence or substitute our assessment of the record evidence for that of the administrative judge; therefore, we agree with her determination that the agency failed to prove specifications 12-17. *Crosby*, 74 M.S.P.R. at 105-06.

¶45        In sum, we find no basis for disturbing the administrative judge's findings that the agency failed to prove specifications 1-6, 9, and 12-17, and two parts of specification 8.  We find, however, that the agency proved specifications 7, 10, 11, and 18, and one part of specification 8.  Because we find that the agency proved these specifications, we also find that it proved the charge of conduct unbecoming a Federal manager.  *See Burroughs v. Department of the Army*, 918 F.2d 170, 172 (Fed. Cir. 1990) (holding that when more than one

specification supports a single charge, proof of one or more, but not all, of the supporting specifications is sufficient to sustain the charge).

Nexus

¶46    Because the administrative judge found that the agency failed to prove the charge and reversed the appellant's removal, she did not make findings as to whether there is a sufficient nexus between the appellant's misconduct and the efficiency of the service, nor did she determine whether removal is a reasonable penalty.  We address those issues here.  It is well settled that there is a sufficient nexus between an employee's misconduct and the efficiency of the service when, as in this case, the conduct occurred at work.  *Parker v. U.S. Postal Service*, 819 F.2d 1113, 1116 (Fed. Cir. 1987); *Miles v. Department of the Navy*, 102 M.S.P.R. 316, ¶ 11 (2006).  Therefore, we find that disciplining the appellant for his misconduct promotes the efficiency of the service.

Penalty

¶47    When examining the penalty imposed by the agency, the Board's function is not to displace management's responsibility or to decide what penalty it would impose, but to assure that management's judgment has been properly exercised and that the penalty selected by the agency does not exceed the maximum limits of reasonableness.  *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 306 (1981).  When, as here, the Board sustains the agency's charge, but not all of the specifications of the charge, the agency's chosen penalty is entitled to deference, and the Board will review that penalty to determine whether it is within the parameters of reasonableness.  *Payne v. U.S. Postal Service*, 72 M.S.P.R. 646, 650 (1996); *see generally Douglas*, 5 M.S.P.R. at 305-06 (providing a nonexhaustive list of factors that are relevant to determine the appropriate penalty).  If the agency's penalty is not reasonable, the Board will mitigate only to the extent necessary to bring it within the parameters of reasonableness, i.e., the Board will apply a maximum reasonable penalty standard.  *Payne*,

72 M.S.P.R. at 651. In applying this standard, the Board will consider the agency's failure to sustain all of its supporting specifications. *Id.* That failure may require, or contribute to, a finding that the agency's penalty is not reasonable. *Id.* Particularly pertinent to this appeal, we note that a general charge like the one here, i.e., conduct unbecoming, may be sustained when the Board finds that the appellant engaged in inappropriate behavior, even though it does not rise to the level of impropriety asserted by the agency; however, the penalty should reflect only the proven level of impropriety. *See Russo v. U.S. Postal Service*, 284 F.3d 1304, 1309-10 & n.2 (Fed. Cir. 2002) (finding that mitigating the agency's removal action to a lesser penalty was appropriate because the linchpin for imposing the penalty of removal was the agency's determination that the appellant had made a racial comment and the Board did not find that such a comment was made).

¶48    The seriousness of the appellant's offense is always one of the most important factors considered by the Board in assessing the reasonableness of an agency's penalty determination. *Rosenberg v. Department of Transportation*, 105 M.S.P.R. 130, ¶ 30 (2007). Here, the agency only proved 5 of the charge's 18 specifications. In determining whether removal is a reasonable penalty for the appellant's sustained misconduct, we consider the facts and circumstances surrounding each of the proven specifications. *See Douglas*, 5 M.S.P.R. at 297 (stating that the facts and circumstances of each case are relevant to determining the penalty).

¶49    Specifications 7 and 8 involve incidents in which the appellant made improper statements. In such cases, the Board has specifically found that we must consider the context and circumstances of the statements in assessing the penalty. *Vernon v. U.S. Postal Service*, 87 M.S.P.R. 392, ¶ 22 (2000). Specification 7 concerns the appellant's use of profanity to describe a Senior Economist's email while discussing the email with him. We find that the seriousness of this misconduct is somewhat reduced because the appellant

immediately apologized for cursing when the Senior Economist took offense, IAF, Tab 5 at 99; and did not use profanity during the rest of the meeting, *id.*, *see Douglas*, 5 M.S.P.R. at 305 (stating that the factors relevant in determining the appropriateness of a penalty include whether the offense was repeated). However, in the absence of evidence showing that profanity was commonplace in the work setting, the appellant's use of profanity cannot be dismissed as inconsequential. As for specification 8, while it was improper for the appellant to reveal the name of an EEO complainant to those who did not need to know this information, there was no showing that this misconduct resulted in any harm to the complainant or the agency.

¶50    We next consider specification 10. Although it was unsuitable for the appellant to place his hands over the mouth of the NMD Project Director during a meeting to prevent him from speaking, the appellant testified without contradiction that he and the Project Director are good friends and that the Project Director did not even remember the incident. HT4 at 274-75 (testimony of the appellant). Similarly, the Project Director confirmed that he had no recollection of this incident and, in any event, stated that such conduct would not have offended him, as he and the appellant had a good relationship. HT3 at 359-60, 380-81 (testimony of the NMD Project Director). Under the circumstances described above, we find that specifications 7, 8, and 10, standing alone, do not warrant severe disciplinary action.

¶51    Specification 11 concerns the appellant's influencing the removal of liability information from a legal memorandum by intimidating the drafting attorneys. This offense had wide implications for the agency, including the potential of financial repercussions and negative impact on the reputation of the agency. The misconduct on the appellant's part appears to have been quite intentional, as the attorneys had already revised the memorandum several times but had not removed the contents with which the appellant disagreed. The misconduct was also directly related to the appellant's duties as COO, a senior

role which unquestionably requires looking out for the overall interests of the agency. For these reasons, we find that specification 11 was highly serious and, in combination with the other sustained specifications, provides support for significant disciplinary action.

¶52    Specification 18 concerns the appellant's asking the HR Director to negotiate with E.D. on his behalf for a higher rating and subsequently sending the HR Director an email with disparaging comments about E.D. This misconduct is directly related to the appellant's duties as a supervisor and was committed for personal gain, as the appellant would have received a significant bonus if his performance rating had been higher. *Douglas*, 5 M.S.P.R. at 305 (stating that relevant factors in determining the appropriateness of a penalty include whether the offense was committed for gain). For these reasons, we find that specification 18 is the most serious of the sustained specifications, providing further support for significant disciplinary action.

¶53    In assessing whether removal is a reasonable penalty for the sustained specifications, we also have considered the following factors: the appellant's supervisory role; his past disciplinary record; his past work record; his length of service, and the notoriety of the offense. As mitigating factors, we acknowledge that the appellant has a good performance record and has not been subject to any prior disciplinary action. IAF, Tab 6 at 74-88, 92-97. Also, while the conduct at issue in specifications 1-4 generated a significant amount of press coverage, IAF, Tab 6 at 4-18, the record does not indicate that the conduct described in the proven specifications gained public notoriety. However, as aggravating factors, we note that the appellant served with the agency for only 3 years and that, as COO, the appellant was a high-ranking supervisor who occupied a position of trust and responsibility. IAF, Tab 6 at 103-05 (COO position description). Thus, the agency has the right to hold him to a higher standard of conduct for purposes of determining the penalty. *See Edwards v. U.S. Postal Service*, 116 M.S.P.R. 173, ¶ 14 (2010) (finding that agencies are entitled to hold supervisors to a higher

standard of behavior than nonsupervisors because they occupy positions of trust and responsibility); *Walcott v. U.S. Postal Service*, 52 M.S.P.R. 277, 284 (finding that an agency may hold a high-ranking supervisor to a higher standard of conduct for purposes of determining the penalty), *aff'd*, 980 F.2d 744 (Fed. Cir. 1992) (Table).

¶54      Although the agency failed to establish much of the specific misconduct, the specifications we do sustain are without question quite serious. Thus, based on the specific facts of this case and the proven level of impropriety, we find that the agency's chosen penalty is within the parameters of reasonableness and that the sustained specifications warrant removal.

## NOTICE OF APPEAL RIGHTS[14]

This Final Order constitutes the Board's final decision in this matter. 5 C.F.R. § 1201.113. You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions

---

[14] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date of issuance of this decision.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain

judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** after your representative receives this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[15]  The court of appeals must receive your petition for review within **60 days** of the date of issuance of this decision. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit

---

[15] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

FOR THE BOARD:                          /s/ for

                                        Jennifer Everling
                                        Acting Clerk of the Board

Washington, D.C.